No. 19,464.

SYLVESTER LEE GARRISON *v.*
PEOPLE OF THE STATE OF COLORADO.
(364 P. [2d] 197)

Decided July 31, 1961. Rehearing denied September 5, 1961.

Messrs. MELLMAN, MELLMAN AND THORN, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK

E. HICKEY, Deputy, Mr. J. F. BRAUER, Assistant, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE HALL delivered the opinion of the Court.

PLAINTIFF in error, to whom we will refer as defendant, was apprehended on July 15, 1958, in England, Arkansas, and was returned to Denver, July 23, 1958. On July 29, 1958, an information was filed in the District Court of Denver, wherein he was charged with the murder of one Mort Freelander, in Denver, on April 26, 1958.

On August 18, 1958, the defendant was arraigned and through his counsel entered his plea of "not guilty" and "not guilty by reason of insanity at the time of the alleged commission of the crime and since." On the same day the court entered an order committing him to the Colorado State Hospital at Pueblo for a period not to exceed thirty days, for observation of his mental condition, to be followed by report of the findings based on such observation.

On September 12, 1958, the Colorado State Hospital forwarded to the court its fourteen-page report finding the defendant then, and at the time of the alleged commission of the crime, legally sane.

On October 14, 1958, defendant requested and was granted permission to withdraw his plea of not guilty by reason of insanity.

On March 2, 1959, defendant requested and was granted permission to reinstate his plea of not guilty by reason of insanity. On this date the court appointed Drs. Cohen and Rymer to examine defendant and to make report to the court of their findings on or about April 6, 1959.

Prior to April 6, 1959, each of the doctors above named made report to the court in writing. Each expressed the

opinion that the defendant was, then, and at the time of the commission of the alleged crime, sane.

On April 6, 1959, the case was set for trial to commence on July 13, 1959, on the question of defendant's sanity. On that day the defendant again requested and was granted permission to withdraw his plea of not guilty by reason of insanity, and at that time the case was set for trial to commence on November 16, 1959, on the plea of "not guilty." On November 16, 1959, the case was continued until November 17, 1959, on which date the defendant again requested and was granted permission to reinstate his plea of not guilty by reason of insanity.

Selection of a jury to try the case on both pleas was commenced on November 17, 1959, and completed on November 23, 1959, on which date the taking of testimony began and was completed on November 27, 1959, following which the jury was instructed on the law and given five forms of verdict. On November 27, 1959, the jury returned two verdicts, (1) finding the defendant sane at the time of the commission of the alleged crime, (2) guilty of murder in the first degree, as charged in the information, and fixing the penalty at death.

Defendant was granted time to file, and did file, a motion for a new trial in which only one ground was urged — namely, newly discovered evidence. On January 29, 1960, this motion was denied and the defendant sentenced to die by lethal gas during the week of May 9, 1960. Execution of the sentence has been stayed and the defendant is here by writ of error seeking reversal.

The defendant did not take the witness stand, and the testimony of no witness is challenged. From the record the following appears:

A lady who was employed as a domestic to clean the Freelander apartment, located at 1446 Gilpin Street, Denver, and who for seven months prior to July 4, 1957, had been keeping company with the defendant, testified that the defendant had often taken her to and from the

Freelander apartment and that she had told defendant that Freelander had a diamond stickpin, a watch and a ring, and that he always paid her in cash.

A man who occupied the apartment across the hall from Freelander testified that at about 11:00 A.M., on April 25, 1958, he heard shouts and groans from the direction of the Freelander apartment. He opened his apartment door and went into the hall. The door to Freelander's apartment was open, Freelander "was laying on the floor with blood running all over him," the defendant came out of Freelander's apartment with a gun in his hand, he pointed the gun at the midsection of the witness and said, "get back there." At that moment another person (never identified) came out of the Freelander apartment and ran out of the building, and the lady who managed the apartment house appeared on the scene and the defendant fled.

The lady who managed the apartment house testified that she heard the commotion in the Freelander apartment and rushed from her downstairs apartment to the Freelander apartment. As she approached the Freelander apartment she saw the defendant and started after him and he fled. She entered the apartment and found Freelander badly injured; she called the doctor and then wrapped Freelander's head and hand with towels. Later she found in the apartment and turned over to the police two small pieces of metal and a wire spring. She further testified that a few days prior to the day of the homicide she had found defendant and an unidentified man in the apartment hall examining the mail boxes. She asked if she could help them and they told her they were looking for a Mr. Fishel and she told them she knew of no such person, whereupon they left.

Medical testimony was to the effect that the cause of Freelander's death was due to scalp and skull injuries.

Joseph F. Moomaw, police officer of Denver in charge of the laboratory sections and an expert in firearms, identified the two metal pieces found in the Freelander

apartment by the caretaker immediately following the attack as *outside* and *inside* base plates from the clip of a 7.65 caliber Beretta automatic pistol. He further testified that these parts could not be used on or be a part of any weapon except a Beretta. He identified the spring as a "follow spring of a type used in the clip of a 7.65 Beretta weapon" — he further testified that such a spring could be used with other make guns of the same caliber. He also identified a 7.65 caliber Beretta automatic pistol as one that the defendant had pawned at Orange, Texas, subsequent to the date of the assault.

Another witness testified that he had sold the above-mentioned Beretta automatic pistol to defendant in Denver on June 29, 1957.

Another witness testified that Garrison had pawned this same weapon to him in Denver on November 16, 1957. The pawn ticket given therefor was produced.

On July 15, 1958, two F.B.I. agents arrested defendant at England, Arkansas; each testified that on the day of his arrest defendant admitted the attack on Freelander. Notes were made of his admissions but no formal statement was made or signed. The statements made by Garrison include the following:

He resided in the Five Points area of Denver; was out of work and needed money badly to pay for a divorce for himself, and for a lady friend whom he expected to marry. He discussed with companions possible ways of obtaining money. Gambling was suggested and tried as a possible source of revenue, but did not produce money. One of his companions (not identified) told him he knew of a man who did not believe in banks and who kept thirty or forty thousand dollars in his apartment. The two agreed on the burglary of this apartment. They visited the apartment house to examine the mail boxes to get the prospective victim's apartment number and when accosted by the caretaker told her they were looking for a Mr. Fishel, a fictitious name. On the morning of April 25, 1958, they went to the apartment house and knocked

on Freelander's door. Freelander, upon opening the door and seeing a gun in defendant's hand, shouted for help, and defendant hit him on the head several times with the gun. People began opening their doors and coming into the hall so they fled.

That afternoon he visited several taverns and heard radio broadcasts giving an account of the assault. He first heard that Freelander had been discharged from the hospital, and shortly thereafter that he was dead and his assailant would be charged with murder. With this turn of events he left Denver, hitchhiked about one hundred miles east, then boarded a bus for St. Louis. On arrival there he purchased a new clip for his Beretta pistol to replace the one that was broken. From St. Louis he went to Arkansas, Louisiana, to Orange, Texas, where he pawned the Beretta pistol, and finally to England, Arkansas, where he was arrested.

This same story was repeated by defendant to Denver officers sent to Arkansas to return him to Denver. It was again repeated to other police officers after his arrival in Denver.

Two medical experts appointed by the court to observe defendant as to his mental state expressed their opinion that defendant was sane.

The only witness called by defendant was a psychiatrist who had examined him during the period March 4 to March 10, 1953. He gave as his opinion that defendant, though an angry man, full of resentment and hatred for authority in general, and cops in particular, he was not insane at the time of his observation in 1953.

All of the foregoing testimony was admitted without objection. Likewise, the gun, the broken parts, the wire spring, the Denver pawn shop ticket and the Orange, Texas, pawn shop business card were all admitted without objection.

Defendant's motion for a new trial urges as ground therefor newly-discovered evidence, to-wit: A declaration made by Freelander to the police, which declaration

was made following the assault "under circumstances of impending death." A copy of the declaration is attached to the motion, which declaration, omitting the formal parts, is as follows:

"DETAILS OF OFFENSE:

"Victim states he answered a knock at his front apartment door, thinking it was his doctor calling on him. 2 large Negroes were at the door and demanded his money. Victim states he tried to push them back out of the door, and when he did so they began to beat him about the face and head. Suspects did not get any money and later fled toward E. 14th Ave. on foot. The apartment manager, Mrs. Burt Forester, FR 7-4801, heard the victim's screams and came to the apartment just as the suspects were leaving. Mrs. Forester stated that the same 2 suspects were seen around the apartment house before."

 It would seem that this newly-discovered evidence, if admitted and considered by a jury, might well serve to materially strengthen the People's case against defendant, serving to corroborate the testimony of the eye witnesses, as well as defendant's admissions. Just how this declaration might be expected to help defendant's case is unclear. Certainly it was not of such character as to lead to the probability that had it been received a different verdict would have been returned.

We perceive no error in denial of the motion.

Counsel appearing for defendant here did not represent him in the trial court.

Two grounds for reversal are urged: First, that reversible error was injected into the case when the People's witness Brown, on direct examination, testified as follows:

"Q. Officer, when you began this interrogation, were you interrogating him as to this specific charge as to the murder? A. No, not to this specific charge. Q. Did you have in your possession any of the technical points of this particular charge — did you know the circumstances of the killing? A. Yes. Q. What circumstances did you

know? A. The information that had been forwarded to the Little Rock office of the FBI stated that among other offenses, I mean among other things in addition to the robbery of a drug store, that Sylvester Lee Garrison was a suspect in other possible violations, one of which being the murder of Mort Freelander during the course of an attempted robbery in Denver."

No objection was made to any of the foregoing questions or answers. There was no motion for a mistrial and no statement by the trial judge. This was not assigned as error in the motion for a new trial.

On cross-examination of this witness, defendant's counsel elicited further and detailed information about the alleged drugstore robbery to the effect that in this robbery he had a gun and should be considered armed and dangerous.

Though we do not sanction witnesses volunteering extraneous matters, we do not deem this slight inadvertence sufficient to justify a reversal. Apparently defendant's counsel did not consider it harmful at the time the statement was made, for he made no objection. Some six weeks after the verdict of the jury had been returned counsel for defendant filed a motion for a new trial and, having had this additional time to reflect on the matter, apparently did not consider it worthy of mention, for nothing with respect thereto is included in the motion filed.

In *Shier v. People,* 116 Colo. 353, 181 P. (2d) 366, the district attorney asked two questions of one of the People's witnesses, each of which called for an answer necessarily touching on the participation or non-participation of defendant in offenses other than that on which he was being tried. The answer to the first question was "No"; to the second, "Yes." Motion for mistrial predicated on the foregoing was denied, and on review in this court it was held, under the circumstances, not ground for reversal. There the court said:

"Neither in the motion for new trial in the district

court, nor in the assignments of error here, have counsel for defendant claimed error resulting from refusal of the trial court to grant a mistrial, on account of the above circumstance. They contend, however, that even though said point was not so raised, nevertheless this court should notice the error and correct it. * * *.

\* \* \*

"A careful examination of the present record convinces us of the defendant's guilt; that he was in no way prejudiced by the above incident; and that under the circumstances justice does not require us to notice the alleged error in the absence of proper reference thereto in the motion for new trial and assignments of error. \* \* \*"

At no time did the district attorney here attempt to elicit testimony from any witness other than relating to the charge of murder. The reference to the drugstore robbery was volunteered by the witness. There is nothing to suggest improper conduct on the part of the district attorney. The testimony was given without objection by defendant's counsel, there was no motion to strike or request that the court direct the jury to disregard the reference to the drugstore robbery. No reference is made to the matter in defendant's motion for new trial, it being based solely on alleged newly-discovered evidence concerning statements made by Freelander before his death. No instruction relative thereto was requested. Under such circumstances no reversible error occurred.

The second ground urged is failure of the trial court to instruct the jury that:

" * * * they could infer a lack of mental capacity from the appearance or conduct of the accused while in their presence or from factual circumstances disclosed by the evidence."

Here, again, defendant's counsel did not request any such instruction—in fact, counsel examined the eighteen instructions given prior to their being given and stated:

394

"Let the record show that counsel for the defendant have examined the instructions numbered 1 through 18, and the defense offers no special instructions nor has any objections to those offered by the court.

"And that we have examined the forms of verdict, of which there are five, and we accept and agree with the forms of the verdicts."

Of the eighteen instructions given, No. 4 properly defines *sound mind*. Nos. 11, 12, 13 and 14 accurately and thoroughly cover the law pertinent to the plea of not guilty by reason of insanity.

Counsel urge that this court in *Mundy v. People,* 105 Colo. 547, 100 P. (2d) 584, has held that in all cases in which a plea of insanity has been interposed it is the duty of the trial judge to give the foregoing as an instruction and that failure so to do constitutes reversible error.

We find no virtue in counsels' interpretation of the holding in the *Mundy* case, and no merit in their contentions as to the duties of the trial judge.

Here there was not one word of testimony that the defendant was insane, and yet this issue was submitted to the jury and the jury was permitted to consider the question of his mental condition. The trial judge in his rulings on the question of insanity fully protected defendant's rights. Defendant cannot complain of rulings more favorable to him than the facts warrant.

We are seldom called upon to review the record of a more cold-blooded and revolting murder. Defendant's guilt was proved beyond a reasonable doubt. A solemn verdict, based upon uncontradicted evidence received without objection, has been returned by the jury and judgment pronounced thereon.

We find no reversible error in the record of this trial.

The judgment is affirmed and it is ordered that the same be executed during the week commencing at midnight December 7, 1961.

Mr. Justice Frantz not participating.